UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

ROBERT C.,[1]

      Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

1:20-CV-01438-LJV
DECISION & ORDER

---

On October 6, 2020, the plaintiff, Robert C. ("Robert"), brought this action under the Social Security Act ("the Act"). He seeks review of the determination by the Commissioner of Social Security ("Commissioner") that he was not disabled.[2] Docket Item 1. On September 15, 2021, Robert moved for judgment on the pleadings, Docket Item 13; on February 8, 2022, the Commissioner responded and cross-moved for

---

[1] To protect the privacy interests of Social Security litigants while maintaining public access to judicial records, this Court will identify any non-government party in cases filed under 42 U.S.C. § 405(g) only by first name and last initial. Standing Order, Identification of Non-government Parties in Social Security Opinions (W.D.N.Y. Nov. 18, 2020).

[2] Robert applied for both Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). Docket Item 11 at 180, 184. One category of persons eligible for DIB includes any adult with a disability who, based on his quarters of qualifying work, meets the Act's insured-status requirements. *See* 42 U.S.C. § 423(c); *see also Arnone v. Bowen*, 882 F.2d 34, 37-38 (2d Cir. 1989). SSI, on the other hand, is paid to a person with a disability who also demonstrates financial need. 42 U.S.C. § 1382(a). A qualified individual may receive both DIB and SSI, and the Social Security Administration uses the same five-step evaluation process to determine eligibility for both programs. *See* 20 C.F.R §§ 404.1520(a)(4) (concerning DIB); 416.920(a)(4) (concerning SSI).

judgment on the pleadings, Docket Item 16; and on March 22, 2022, Robert replied, Docket Item 17.

For the reasons stated below, this Court grants Robert's motion in part and denies the Commissioner's cross-motion.[3]

## STANDARD OF REVIEW

"The scope of review of a disability determination . . . involves two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). The court "must first decide whether [the Commissioner] applied the correct legal principles in making the determination." *Id*. This includes ensuring "that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Social Security Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (alterations omitted) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). Then, the court "decide[s] whether the determination is supported by 'substantial evidence.'" *Johnson*, 817 F.2d at 985 (quoting 42 U.S.C. § 405(g)). "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability

---

[3] This Court assumes familiarity with the underlying facts, the procedural history, and the decision of the Administrative Law Judge ("ALJ") and refers only to the facts necessary to explain its decision.

determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986.

## DISCUSSION

Robert argues that the ALJ failed to develop the record by not obtaining missing records from Robert's cardiologist, Dr. Alfred Fast. Docket Item 13; *see also* Docket Item 11 at 40, 52. This Court agrees that the ALJ erred and, because that error was to Robert's prejudice, remands the matter to the Commissioner.

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (same). Thus, "where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel or . . . by a paralegal.'" *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (quoting *Perez*, 77 F.3d at 47). On the other hand, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Id.* at 79 n.5 (quoting *Perez*, 77 F.3d at 48).

"[T]he opinion of a treating physician is an especially important part of the record to be developed by the ALJ." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 343 (E.D.N.Y. 2010). That is so because "[u]nder the 'treating-physician rule,' the opinion of a claimant's treating physician 'regarding the nature and severity of [the claimant's] impairments' will be given controlling weight if it 'is well-supported [sic] by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)).  For that reason, the Commissioner must "make every reasonable effort to obtain from the individual's treating physician . . . all medical evidence . . . necessary in order to properly make [a disability determination] prior to evaluating medical evidence obtained from any other source on a consultative basis." *Id.* (quoting 42 U.S.C. § 423(d)(5)(B)).

      Here, there is a clear gap in the record regarding Robert's heart condition after he received a pacemaker in early 2017, and the ALJ failed to obtain treatment records—for example, from Dr. Fast, Robert's treating cardiologist—that would have filled that gap.  Indeed, even though Robert's cardiac issues are central to his disability claim, there is absolutely nothing from his cardiologist in the record.  Those errors require remand.

      The medical record is replete with evidence of Robert's cardiac issues, but it includes almost nothing about his arrhythmia and functional capacity after receiving a pacemaker.  The assessments that took place before insertion of the pacemaker show that Robert suffered from "chest pain [and] discomfort," "shortness of breath," and "lightheadedness/syncope."  Docket Item 11 at 303.  A May 2016 assessment noted that Robert had been experiencing "frequent skipping heart beats and dizziness" for months.  *Id.* at 339.  In fact, Robert's cardiac issues were severe enough to warrant placement of a pacemaker in early 2017.  *Id.* at 428.  But there is little evidence of Robert's cardiac condition after the pacemaker was inserted and whether the pacemaker effectively alleviated his heart-related symptoms.

In fact, almost all the medical records predate the placement of Robert's pacemaker, *see id.* at 278-424 (medical records before placement of the pacemaker), and the records of visits after the placement of the pacemaker say little or nothing about Robert's heart issues, *see id.* at 428-430 (follow-up appointment very shortly after placement of pacemaker); 436-440 (psychiatric exam); 442-446 (consultative exam about two months after placement of pacemaker); 447-455 (review of records about three months after placement of pacemaker); 456-461 (bloodwork review); 463-467 (eye exam). In fact, the only post-pacemaker record of a visit related to Robert's cardiac issues with one of his medical providers is from about two weeks after insertion of the pacemaker, when Robert reported to Nurse Practitioner Jennifer C. Russell that he was doing well but still "complain[ed] of shortness of breath." *Id.* at 428. The two most recent medical records are from 2019, but they address only a "follow up for blood test results" and an exam by Evca Eyecare. *See id.* at 456-68. Not surprisingly, neither of those records addresses Robert's adjustment to his pacemaker or opines about his ability to function with the pacemaker. *Id.* And other than the two opinions of the consultants—one of whom examined Robert and one of whom only looked at his records, *see infra* at 7—the only other post-pacemaker record involved a psychiatric exam. *Id.* at 436-440.

In his decision, the ALJ notes that Robert's "[h]eart rhythm issues have not been resolved with the pacemaker" and that Robert "was told by his doctor that [his] symptoms are due to his body trying to adjust to the device," but the ALJ does not elaborate further. *Id.* at 26. And as noted above, the ALJ had nothing from Robert's cardiologist—and almost nothing from any other medical provider—that shed any light

on Robert's cardiac condition with a pacemaker or any functional limitations he still had as a result of the unresolved heart rhythm issues.

What is more, and even more basically, despite the numerous references to Robert's cardiac issues, the ALJ did not have a single record from Robert's cardiologist, Dr. Fast.  Indeed, the ALJ acknowledged Robert's cardiac history, including insertion of the pacemaker, *see* Docket Item 11 at 26-28, but he evaluated Robert's condition and formulated Robert's RFC without the benefit of any records from Robert's treating cardiologist.  *See id.* at 24-28.  And that was another gap in the record that the ALJ was obliged to fill.

It is not as though more information about Robert's status post pacemaker or about his treatment with a cardiologist did not exist or that the ALJ was unaware of its existence.  On October 11, 2019, just before Robert's hearing, Robert's counsel notified the ALJ that she was "further requesting records" that were "presumed to be material in [Robert's] disability case," including records from Dr. Fast who was noted as having treated Robert from "01/01/2017 to PRESENT."  *Id.* at 273 (emphasis in original).  At the hearing, Robert testified that he saw Dr. Fast every six months for his heart condition, *id.* at 53, and the medical records refer to Dr. Fast as well, *see, e.g.*, *id.* at 428.  Robert also testified that he saw Dr. Fast and discussed his continuing symptoms with him after the pacemaker was inserted.  *Id.* at 51.  But despite knowing about Dr. Fast and the existence of records after insertion of the pacemaker, the ALJ failed to obtain those records.

In fact, the ALJ's decision never even mentions Dr. Fast by name but says only that Robert "sees a cardiologist every six months."  *Id.* at 26.  And while the decision

relies on the opinions of two non-treating physicians—David Brauer, M.D., and G. Feldman, M.D.—who examined Robert or looked at his records after insertion of the pacemaker, *see id*. at 28, the ALJ's discussion of those opinions does more to reinforce the gap in the record than to assure this Court that the ALJ based his decision on a complete record.

Dr. Brauer, a consultant, examined Robert only once—two months after the placement of the pacemaker. *Id.* The ALJ found Dr. Brauer's opinion "somewhat persuasive" and "consistent with his benign findings on a single examination." *Id.* Dr. Brauer opined that Robert was not limited in his "ability to perform exertional activities," but the ALJ declined to accept that opinion because Dr. Brauer "does not allow for a reasonable accommodation of the claimant's heart condition regarding exertional level." *Id.* In other words, the ALJ found that Dr. Brauer's opinion after his one-time examination did not accurately assess Robert's exertional limits and he discounted the opinion for that reason.

On the other hand, the ALJ did accept the exertional limitations found by Dr. Feldman, a state agency medical consultant who never examined Robert but only reviewed his records. *Id.* More specifically, the ALJ accepted Dr. Feldman's opinion that Robert "was capable of a light exertional level, with no postural, environmental, or other restrictions" and that his "heart condition [was] treated by pacemaker placement and medication." *Id.* But Dr. Feldman's opinion was based only on a review of Robert's medical records, and it was rendered in 2017, only three months after placement of the pacemaker. *Id.* at 447. It therefore offers very little about Robert's adjustment to his pacemaker over time and his ability to function after its insertion.

Furthermore, Robert's testimony at the hearing in 2019 suggests that the pacemaker did not solve his heart problems. For example, Robert testified that he "get[s] winded extremely easily," that adjusting to the pacemaker has "been very uncomfortable," and that he still "get[s] pain shooting across his chest" which Dr. Fast told him was his "body trying to adjust." *Id.* at 50-51. In fact, Robert testified that despite the pacemaker, he still experiences chest pain weekly and that he sees Dr. Fast "every time [Dr. Fast] wants to see [him]" or "every six months." *Id.* at 52-53. And the ALJ himself explicitly noted that, at least according to Robert, Robert's "[h]eart rhythm issues have not been resolved with the pacemaker." *Id.* at 26.

The Commissioner argues that the "ALJ fulfilled [his] duty to develop [the p]laintiff's complete medical history" by making "reasonable efforts . . . to assist [Robert and his counsel] with securing Dr. Fast's records," including holding the record open for seven weeks after the hearing. Docket Item 16-1 at 6-8. Although an "ALJ may rely on [a] claimant's counsel to obtain missing evidence under some circumstances," the Second Circuit "has stopped short of holding that the ALJ may delegate his or her duty to the claimant's counsel." *Sotososa v. Colvin*, 2016 WL 6517788, at *4 (W.D.N.Y. 2016) (quoting *Jordan v. Comm'r of Soc. Sec.*, 142 F. App'x 542, 543 (2d Cir. 2005) (summary order)). For that reason, the ALJ has "an 'independent' and 'affirmative' duty to develop the record"—a duty that includes "seeking out additional documentation . . ., even where counsel has previously promised (but failed) to provide the documents." *Harris v. Colvin*, 2013 WL 5278718, at *8 (N.D.N.Y. 2013); *see also Newsome v. Astrue*, 817 F. Supp. 2d 111, 137 (E.D.N.Y. 2011) ("The fact that the ALJ requested

additional information from the [p]laintiff's attorney and did not receive that information [did] not relieve the ALJ of his duty to fully develop the record.")

Although the ALJ held the record open for seven weeks so that Robert's counsel could submit missing records, including Dr. Fast's records, *see* Docket Item 11 at 19, 31, 40, the ALJ did not do anything else to complete the record. For example, there is no evidence that the ALJ followed up with Robert's counsel to see whether counsel had obtained any of the missing records. *Cf. Jordan*, 142 F. App'x at 543 ("ALJ fulfilled his duty to develop the . . . record" where, after counsel volunteered but failed to obtain records, ALJ contacted counsel "to remind him that no evidence had been received and that a decision would be made on the existing record unless such evidence was timely submitted."). Nor is there any evidence that the ALJ attempted to independently get the records from Dr. Fast. *See Sainsbury v. Comm'r of Soc. Sec.*, 2019 WL 4643607, at *3 (W.D.N.Y. 2019) (finding that "the ALJ did not make the requisite 'reasonable effort' to affirmatively develop the record" where ALJ did not "follow[] up with counsel about the missing [medical] records" or "independently attempt[] to obtain the missing medical records from plaintiff's treatment providers"). And an ALJ does not satisfy the obligation to ensure that the record is complete—at least with respect to records as important as the cardiac records here—simply by giving a claimant's counsel the opportunity to do so. *See e.g.*, *Sotososa*, 2016 WL 6517788, at *4 ("The ALJ did not satisfy his duty to develop the record just because he told [claimant's] attorney to obtain the missing records.").

The Commissioner also argues that the evidence was sufficient even without Dr. Fast's treatment notes. Docket Item 16-1 at 9. But it is difficult to envision a scenario in

9

which the cardiologist's records will not be necessary when a claimant's primary physical ailment stems from cardiac issues. And for the reasons stated above, this case certainly does not present that scenario.

In sum, "the ALJ ha[s] an affirmative duty to seek out and obtain [ ] relevant records . . . in order to properly develop [p]laintiff's medical history . . ., and his failure to do so constitutes legal error." Hilsdorf, 724 F. Supp. 2d at 346; see generally Rosa, 168 F.3d at 80 (remanding for ALJ's failure to obtain records from physicians identified by claimant during her testimony and ignoring a clear gap in the record). The ALJ committed that error here by failing to obtain medical records evidencing Robert's adjustment to his pacemaker or any records whatsoever from Dr. Fast. The case is therefore remanded so that the ALJ can obtain the necessary and relevant medical records, including—and especially—the records of Dr. Fast.

## **CONCLUSION**

The Commissioner's motion for judgment on the pleadings, Docket Item 16, is DENIED, and Robert's motion for judgment on the pleadings, Docket Item 13, is GRANTED in part and DENIED in part. The decision of the Commissioner is VACATED, and the matter is REMANDED for further administrative proceedings consistent with this decision.

SO ORDERED.

Dated:   July 29, 2022
         Buffalo, New York

                                ***/s/ Lawrence J. Vilardo***
                                LAWRENCE J. VILARDO
                                UNITED STATES DISTRICT JUDGE